# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RANDAL STRAUSS and DIANE STRAUSS,

                    Plaintiffs,

v.                                                    Case No. 11-CV-981-JPS

CHUBB INDEMNITY INSURANCE
COMPANY, VIGILANT INSURANCE
COMPANY, FEDERAL INSURANCE
COMPANY, and GREAT NORTHERN
INSURANCE COMPANY,

                    Defendants,

---

RANDAL STRAUSS and DIANE STRAUSS,

                    Plaintiffs,

v.

CHARTIS PROPERTY CASUALTY                Case No. 12-CV-062-JPS
COMPANY,

                    Defendant.

# ORDER

## 1.      BACKGROUND

In connection with homeowners' insurance issued by Defendants Chubb Indemnity Insurance Company ("Chubb"), Vigilant Insurance Company ("Vigilant"), Federal Insurance Company ("Federal"), and Great Northern Insurance Company ("Great Northern") (collectively, the "Chubb Defendants"), Plaintiffs Randal Strauss ("Mr. Strauss") and Diane Strauss ("Mrs. Strauss" and, together with Mr. Strauss, the "Strausses") bring claims against the Chubb Defendants for: (i) declaratory judgment regarding coverage under the insurance; (ii) denial of insurance coverage in bad faith;

and (iii) "12% interest on their insurance claim per Wisconsin Statute [§] 628.46." (collectively, the "Strauss-Chubb Claims") (Docket #67).[1] The Chubb Defendants move for summary judgment on the Strauss-Chubb Claims. (Docket #54). As against the Chubb Defendants, the Strausses move for "partial summary judgment declaring that the continuous trigger theory applies to the Strausses' loss and that the Strausses have shown an initial grant of coverage under the Chubb Defendants' policies." (Docket #64, 2-3).

In addition, in connection with homeowners' insurance issued by Defendant Chartis Property Casualty Company ("Chartis"), the Strausses bring claims against Chartis for: (i) declaratory judgment regarding coverage under the insurance; (ii) breach of contract; and (iii) denial of insurance coverage in bad faith (collectively, the "Strauss-Chartis Claims"). (Docket #1).[2] Chartis moves for summary judgment on the Strauss-Chartis Claims. (Docket #58, 1).

In an order dated March 23, 2012, the Court granted motions to consolidate: (i) the action in which the Strauss-Chubb Claims were brought (11-CV-981); and (ii) the action in which the Strauss-Chartis Claims were brought (12-CV-062).

2.      FACTS

The subject of these actions is the Strausses' home located at 104N 315E Eastwyn Bay Drive in Mequon, Wisconsin (the "House"). (Docket #93, 1-2); (Docket #62-3, 3) and *see* (Docket #101, 2). Construction of the House concluded in 1994. (Docket #93, ¶ 2); (Docket #101, ¶ 1).

---

[1] References to a docket entry number relate to the docket for Case No. 11-CV-981 unless noted otherwise.

[2] Docket #1 refers to that entry number under 12-CV-062.

Case 2:11-cv-00981-JPS   Filed 01/02/13   Page 2 of 25   Document 147

In October of 2010, the Strausses discovered water damage at the House (the "Water Damage"). (Docket #82, ¶ 11); (Docket #101, ¶ 1).[3] In this connection, the Strausses submitted claims to the defendants before the end of that year. (Docket #82, ¶ 13); (Docket #1[4], ¶ 15) and (Docket #101, ¶ 5).

In a letter dated October 3, 2011, the Chubb Defendants denied the Strausses' claim. (Docket #8-17).

As of November 2012, Chartis has paid $85,290.54 to the Strausses in connection with the Water Damage (Docket #101, 11 and 66). However, Chartis affirmatively asserts that no additional amount is due to the Strausses. (Docket #60, 1-2).

### 2.1    The Strauss-Chubb Claims

The Chubb Defendants filed various insurance policy documents as exhibits to their initial answer (the "Chubb Defendants' Insurance Policy Documentation"). (Docket #8). The Strauss-Chubb Claims are brought on the Chubb Defendants' Insurance Policy Documentation. (Docket #67, 5-6). The earliest reference to the House (chronologically-speaking) in that documentation is in a document titled "Premium Summary Renewal" that bears an "Effective date" of "10/1/93" and a "Policy period" of "10/1/93 to 10/1/94" that is coupled with a document titled "Coverage Summary Renewal" that bears the same "Effective date" and "Policy period" and was

---

[3] The defendants dispute the exact date the Strausses *first* discovered the Water Damage. (Docket #82, ¶ 11); *See* (Docket #101, ¶¶ 89-98).

[4] 12-CV-62.

Case 2:11-cv-00981-JPS   Filed 01/02/13   Page 3 of 25   Document 147

"Issued by" Vigilant. (Docket #8-1, 1 and 3).[5] This general pattern of documentation continues for each following year up to an "Effective date" of "10/1/99" and "Policy period" of "10/1/99 to 10/1/00" (Docket #'s 8-2 through 8-7, 1 and 3).

The remainder of the Chubb Defendants' Insurance Policy Documentation appears to relate to policy periods from October 1, 2000, to October 1, 2005, and be issued variously by: Federal (Docket #8-8, 3; #8-9, 7); Vigilant (Docket #8-10, 9; #8-11, 5 and 11); Chubb (Docket #8-13, 11); and Great Northern (Docket #8-14, 13).

The Chubb Defendants' Motion for Summary Judgment argues both that the Strauss-Chubb Claims: (1) are time-barred under both Wis. Stat. § 631.83(1)(a) and a suit limitation clause; and (ii) "do not even implicate the Chubb Defendants' policies because the lost first manifested many years after the last policy issued by one of the Chubb Defendants expired" and "Wisconsin follows a 'manifestation trigger' for first-party property insurance, which means that only the insurance policy in effect when the loss manifests is required to respond." (Docket #54, 2).

---

[5] This first reference to the House indicates that the House is a "Property covered" for purposes of "LIABILITY" coverage. (Docket #8-1, 1). In a subsequent "Coverage Update" bearing an "Effective Date" of "5/3/94" the House is "Added" to the policy for, *inter alia*, "$864,000 DELUXE COVERAGE" which appears to be property coverage (in contrast to liability coverage). *See* (Docket #8-1, 45). Notably, that page warns, *inter alia*, "[t]o keep your records up to date, please attach this update to your existing policy." (*Id.*). Notwithstanding all of this, the Chubb Defendants and the Strausses submit an undisputed proposed material fact to the Court stating that "[t]he Chubb Defendants provided insurance coverage for the Property between October 1994 and October 2005" (Docket #131, ¶ 3) without reconciling that proposed fact with the ostensible coverage of the House that began at least as early as May 3, 1994, nor do they providing the "existing policy" to which the May 3, 1994 "Coverage Update" refers. The Court will refer to that existing policy as the "Root Policy" hereafter.

Proposed material facts submitted by the Chubb Defendants reference, *inter alia*: (i) a provision titled "'Legal Action Against Us'" (the "Legal Action Against Us Provision") (Docket #56, ¶ 17); and (ii) a definition of the term "'occurrence' as 'a loss or accident to which this insurance applies occurring within the policy period.'" (*Id.*, ¶ 18).[6] In support of these two proposed material facts, the Chubb Defendants cited only "*See* Answer to Complaint, Document 8, Exs. A, B, C, D, E, F, G, H, I, J, K, L, M." (Docket #56, ¶¶ 17 and 18).[7] In response, the Strausses did not dispute the Chubb Defendants' proposed fact regarding the Legal Action Against Us Provision (Docket #93, ¶ 17) and the Strausses disputed the Chubb Defendants' proposed fact regarding the definition of "occurrence" only insofar as the Strausses claim

---

[6] The Court raises these two particular proposed material facts as examples because the Legal Action Against Us Provision may have bearing on whether the Strauss-Chubb Claims are time-barred (the first of two grounds raised in the Chubb Defendants' Motion for Summary Judgment) and the definition of the term "occurrence" may have bearing on whether the Chubb Defendants' policies are implicated (the second of two grounds raised in the Chubb Defendants' Motion for Summary Judgment).

The following clarifies briefly why the Legal Action Against Us Provision may be salient. The Strausses cite a range of cases they say support the proposition that parties to an insurance contract are free to contract to *lengthen* the period of limitation beyond any relevant statutory term, *e.g.*, *Keiting v. Skauge*, 198 Wis.2d 887, 894 (Wis. Ct. App. 1995) (holding, in relevant part, "Where the parties have not contracted for a different period of limitations…However, where the parties freely and voluntarily wish to alter that state of affairs, public policy supports their right to do so"), and the Chubb Defendants attempt to distinguish the fact patterns (Docket #109, 4-5) while ignoring the elephant in the room: the Wisconsin public policy which "favors freedom of contract, in the absence of overriding reasons for depriving the parties of that freedom." *Cieslewicz v. Mutual Service Cas. Ins. Co.*, 84 Wis.2d 91, 103 (Wis. 1978).

[7] This blithe citation to the Chubb Defendants' Insurance Documentation references over 700 pages of *non-searchable* material submitted in portable document format ("PDF").

that "the definition of 'occurrence' in each of the Chubb Defendants' Policies contains additional language." (Docket #93, ¶ 18).

In an order dated December 14, 2012, the Court directed both the Chubb Defendants and the Strausses to file revised versions of their respective submissions (Docket #'s 56 and 93) that include "pinpoint citations keyed to PDF pagination for each and every citation to any of Exhibits A through M to Docket #8 by no later than Wednesday, December 19, 2012." The Court has received the amended documents. (Docket #'s 130 and 131).

As for the Legal Action Against Us Provision, the Chubb Defendants' citation in support of the corresponding proposed material fact now includes citations to PDF pagination as well as the following edification in a footnote:

> For the Court's reference, at the time of the renewal of each policy period, Chubb[8] mailed the Insured a new declarations page confirming the renewal and a table of contents listing the forms that comprised the policy, but only included complete versions of any of the policy forms that had changed since the last renewal. Therefore, some of these citations cite to the table of contents page, which shows that the form–and the language it contains–did not change for that policy period.

(Docket #130, 4 n.1).

In response, the Strausses: (i) again do not dispute the proposed fact regarding the "Legal Action Against Us Provision" (Docket #131, ¶ 17); (ii) re-state their position that "the definition of 'occurrence' in each of the Chubb Defendant Policies contains additional language" (*Id.*, ¶ 18); and (iii) write:

> For purposes of this motion, the Strausses do not dispute the Chubb Defendants' explanation in Footnote No. 1 regarding the citation of the Chubb policies.

---

[8] The Court notes that the term "Chubb" is not defined in Docket #130. This lapse by counsel adds additional murkiness into an already opaque explanation.

Case 2:11-cv-00981-JPS   Filed 01/02/13   Page 6 of 25   Document 147

(Docket #131, 6 n.2).

According to the Chubb Defendants and the Strausses, the Legal Action Against Us Provision and the definition of the term "occurrence" both first appear in the Chubb Defendants' Insurance Documentation (Docket #8-1) at page 47. *See* (Docket #131, ¶ 17). That page is only a "Table of Contents" with a stated "Effective date" of "5/3/94" and it informs Mr. Strauss (the named insured): "[t]o keep your records current, please attach this update to your policy." As explained in footnote 5 *supra*, the Court views this as a reference to the Root Policy. The Root Policy does not appear to be among the Chubb Defendants' Insurance Documentation or otherwise submitted to the Court.

As much as the Court would like to narrow the issues for trial, because: (i) the Strauss-Chubb Claims are grounded in the Chubb Defendants' Insurance Documentation; (ii) a subset of the Chubb Defendants' Insurance Documentation incorporates the Root Policy by reference; (iii) the Root Policy is not in the record before the Court; and (iv) more generally, the interrelationship of the Chubb Defendants' Insurance Documentation requires further clarification on the record, the Court is obliged to conclude that any summary judgment in respect of the Strauss-Chubb Claims is inappropriate at this juncture.

The Court acknowledges that the Chubb Defendants and the Strausses have submitted a significant amount of briefing on a purported choice between the so-called "continuous trigger" theory and the so-called "manifestation" theory as each relates to the concept of when an on-going loss is said to have "occurred' for purposes of an occurrence-based homeowner's insurance policy. *See e.g.*, (Docket #55, 11-19); (Docket #91, 17-

Case 2:11-cv-00981-JPS   Filed 01/02/13   Page 7 of 25   Document 147

24). Pending clarification of the interrelationship of the Chubb Defendants' Insurance Documentation on the record at trial, the Court finds that the wiser exercise of discretion is to rule definitively on this "continuous trigger" versus "manifestation" theory debate only after the operative contractual terms have been ascertained.

This being said, the Court observes that, among the Chubb Defendants' Insurance Documentation, in a document with an "Effective Date" of "10/1/02[,]" the term "Occurrence" is defined as follows: "Occurrence means a loss or accident to which this insurance applies occurring within the policy period. Continuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence." (Docket #8-10, 15).

The Chubb Defendants assert boldly (arguably brazenly) that "[a] 'manifestation trigger' is applicable in *first-party* property insurance coverage cases in Wisconsin." (Docket #55, 11). They go on to explain that "[u]nder a manifestation trigger of coverage, only the policy in effect when the loss first manifests is obligated to respond." (*Id.*). Curiously, to support the first of these two assertions, the Chubb Defendants make public policy arguments (Docket #55, 17-18) and variously cite to: (i) Wisconsin state court cases the Chubb Defendants explicitly characterize as concerning "*third-party* liability policies" (*Id.*, 11); (ii) a federal court case from the Eastern District of Wisconsin from which the Chubb Defendants infer application of a manifestation trigger theory (*Id.*, 12); (iii) various decisions of foreign jurisdictions (*e.g.*, the New Jersey and Texas Courts of Appeal) (*Id.*, 13); and (iv) select commentary (*e.g.*, law review articles) (*Id.*, 14). Put plainly, there is a conspicuous absence of *Wisconsin state court* precedent applying the

"manifestation trigger" to first-party property insurance cases. Rather, the Chubb Defendants ask the Court to go out on a limb and recognize a distinction not yet observed by *Wisconsin state courts*. The Seventh Circuit very recently declined to do so in a decision dated June 25, 2012:

> Safeco next argues that the district court wrongly used the continuous trigger theory to determine the date of harm based on the policy's language limiting coverage to "losses occurring during the policy period." Wisconsin applies, along with the majority of courts, the continuous trigger theory to determine the date of injury in cases where the exact date of harm is uncertain and potentially occurring over several policy periods. *See Soc'y Ins. v. Town of Franklin*, 233 Wis.2d 207, 607 N.W.2d 342, 346 (Wis.Ct.App.2000) (adopting the continuous trigger theory to find that an injury "occurs continuously from exposure until manifestation" (quoting Michael G. Doherty, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L.Rev. 257, 261 (1997))). Safeco asks us to carve out an exception and hold, *despite a dearth of Wisconsin caselaw*, that the continuous trigger theory should only apply in third-party coverage cases because the questions presented in third-party cases (e.g., which policy should defend and indemnify against environmental contamination claims spanning multiple policy periods?) aren't present in first-party property damage claims. *We aren't inclined to adopt an approach that lacks support from Wisconsin's caselaw*, but even if we did, Safeco's cases in support of its position adopted a manifestation theory for determining liability when a latent progressive condition causes property damage. *See Winding Hills Condo. Ass'n v. N. Am. Specialty Ins. Co.*, 332 N.J.Super. 85, 752 A.2d 837, 840 (N.J.Super.Ct.App.Div.2000); *Prudential–LMI Com. Ins. v. Superior Court*, 51 Cal.3d 674, 274 Cal.Rptr. 387, 798 P.2d 1230, 1246–47 (1990). Given the finding that the loss manifested during the policy period, the result would be the same.

*Miller v. Safeco Ins. Co. of America*, 683 F.3d 805, 810-811 (7th Cir. 2012) (emphasis added). Pointing to the last sentence in the passage above, the

Case 2:11-cv-00981-JPS   Filed 01/02/13   Page 9 of 25   Document 147

Chubb Defendants argue that the remainder of the passage is *dicta*, all the while selectively ignoring the Seventh Circuit's comment that "We aren't inclined to adopt an approach that lacks support from Wisconsin's caselaw, …." *Id.*; (Docket #55, 15). With the benefit of the foregoing analysis, this Court is similarly disinclined.

### 2.2 The Strauss-Chartis Claims

In June of 2010, Chartis issued a "Homeowners" insurance policy providing certain property and liability coverages to Mr. Strauss for the period from June 1, 2010, to June 1, 2011 (the "First Chartis Policy Period"), and this policy was renewed for the period June 1, 2011, to June 1, 2012 (the "Second Chartis Policy Period") (together, "Chartis' Policy").[9] (Docket #62-3, 3); (Docket #62-3, 41); (Docket #101, ¶ 2). Chartis' Policy covers the insured "against all risks of direct physical loss or damage to [the insured's] house, contents, and other permanent structures unless an exclusion applies." (Docket #62-3, 9 and 47) (bolding omitted). The House is an insured location under Chartis' Policy. (Docket #62-3, 3, 8, 41 and 46); (Docket #101, ¶¶ 1 and 2).

Chartis' Policy provides "Dwelling" coverage for the House up to a "COVERAGE LIMIT"[10] and states that the "PAYMENT BASIS" for that coverage is "Guaranteed Rebuilding Cost" (Docket #62-3, 3 and 41).

---

[9] The Court has not located among any of the proposed facts filed in this consolidated case a fact alleging (nor citation to any evidence establishing) that Mrs. Strauss is indeed married to Mr. Strauss. This is salient because only Mr. Strauss is expressly named as an insured on the policies submitted to the Court yet the actions are brought by the Strausses. This said, Chartis' Policy, for example, defines "Insured Person" to include a spouse. *See* (Docket #62-3, 8).

[10] $2,141,000 for the First Chartis Policy Period (Docket #62-3, 3) and $2,343,960 for the Second Chartis Policy Period (*Id.* at 41).

"Guaranteed Rebuilding Cost coverage means that for a covered loss [Chartis] will pay the reconstruction cost of your house or other permanent structures, for each occurrence, even if this amount is greater than the amount of coverage shown on the Declarations Page." (*Id.*, 9 and 47) (bolding omitted). In turn, "occurrence" is defined, in relevant part, as "[a] loss or an accident, to which this insurance applies, including continuous or repeated exposure to substantially the same general harmful conditions, which occurs during the Policy Period and results in personal injury or property damage; …." (*Id.*, 8 and 46) (bolding omitted). The phrase "property damage" "means physical injury to, destruction of, or loss of use of tangible property and the resulting loss of its use." (*Id.*, 9 and 47).

3.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In other words, in determining whether a genuine dispute of material fact exists, the court must construe all reasonable inferences in favor of the non-movant. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983).

4.    CHARTIS' MOTION FOR SUMMARY JUDGMENT

Chartis' Motion for Summary Judgment argues that: (i) the Water Damage was not fortuitous (Docket #60, 2); (ii) the Strausses' claim for the Water Damage is barred by "the 'known loss' or 'loss in progress' doctrine" (Docket #60, 25); (iii) even if the Water Damage was fortuitous and the Strausses' claim for the Water Damage is not barred by the "known loss" or "loss in progress" doctrines, the "'Faulty, Inadequate or Defective Planning[,]'" "'Gradual or Sudden Loss[,]'" and "'Fungi or Bacteria[,]'" exclusions combine to exclude all of the Water Damage except "ensuing" "active water damage which occurred during the Chartis policy period" (Docket #60, 2); (iv) "the paid mold claim is subject to the Chartis Policy sublimit of $10,000 for 'Ensuing Fungi or Bacteria'"; (v) "The Strausses' Additional Living Expense [under the Chartis policy] is not covered because the house was not uninhabitable and the Strausses never moved out" (*Id.*); and (vi) "at the very least, whether [Chartis' policy] covers the Strausses' claims is 'fairly debatable' such that summary judgment should be granted for Chartis and against the Strausses' on their Bad Faith action." (*Id.*, 2-3).

5.    ANALYSIS

The parties' citizenship is diverse within the meaning of 28 U.S.C. § 1332 (a)(1), the amount-in-controversy requirement of § 1332 is satisfied, and venue pursuant to 28 U.S.C. § 1391 is proper. (Docket #74, 3-4); (Docket #6, 2-3).

A federal district court sitting in diversity "is to apply the law of the state in which the court sits with respect to substantive matters. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 633 (7th Cir. 2002).

In Wisconsin, insurance contract interpretation "presents a question of law" for courts. *American Family Mut. Ins. Co. v. Am. Girl, Inc.*, 286 Wis.2d 16, 32 (2004). In *Am. Girl*, the Wisconsin Supreme Court set forth its analytical approach to insurance contract disputes as follows:

> Insurance polices are construed as they would be understood by a reasonable person in the position of the insured. *Kremers–Urban Co. v. American Employers Ins. Co.*, 119 Wis.2d 722, 735, 351 N.W.2d 156 (1984). However, we do not interpret insurance policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium. *Wisconsin Label*, 233 Wis.2d 314, ¶ 25, 607 N.W.2d 276 ¶ 24. Our procedure follows three steps. First, we examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage. If it is clear that the policy was not intended to cover the claim asserted, the analysis ends there. If the claim triggers the initial grant of coverage in the insuring agreement, we next examine the various exclusions to see whether any of them preclude coverage of the present claim. Exclusions are narrowly or strictly construed against the insurer if their effect is uncertain. *Cardinal v. Leader Nat'l Ins. Co.*, 166 Wis.2d 375, 382, 480 N.W.2d 1 (1992). We analyze each exclusion separately; the inapplicability of one exclusion will not reinstate coverage where another exclusion has precluded it. Exclusions sometimes have exceptions; if a particular exclusion applies, we then look to see whether any exception to that exclusion reinstates coverage. An exception pertains only to the exclusion clause within which it appears; the applicability of an exception will not create coverage if the insuring agreement precludes it or if a separate exclusion applies. *Silverton Enters. v. Gen. Cas. Co.*, 143 Wis.2d 661, 422 N.W.2d 154 (Ct.App.1988).

286 Wis.2d at 32-33.

As explained more fully *infra* in Section 5.3, on the state of the record before it, the Court is obliged to conclude that genuine disputes of material

fact remain as to which "risks" "caused" the Strausses' claimed and uncompensated "direct physical" losses to the House.[11]

### 5.1    Is Rainwater Infiltration Fortuitous?

Chartis' Motion for Summary Judgment (including its various supporting materials) does not appear to argue that the Water Damage is attributable to any water damage other than rainwater infiltration (*e.g.*, leaky pipes). *See, e.g.*, (Docket #101, ¶ 4). Therefore, the Court will consider whether rainwater infiltration is considered fortuitous under Wisconsin law.

Chartis cites to *Glassner v. Detroit Fire and Marine Ins. Co.,* 23 Wis.2d 532, 536 (1964), for the proposition that "[a]n 'all-risk' policy is a promise to pay for loss caused by a fortuitous and extraneous happening, but it is not a promise to pay for loss or damage which is almost certain to happen because of the nature and inherent qualities of the property insured." (Docket #60, 24-25). In the view of the *Glassner* court, damage is fortuitous if "it resulted from a 'risk,' as contrasted with being an ordinary and almost certain consequence of the inherent qualities and intended use of the property." 23 Wis.2d at 536. Giving examples of "cause[s] which might be considered not to be 'risks' at all, but almost certain consequences" the *Glasser* court listed "loss by wear

---

[11] As noted *supra* in Section 2.2, Chartis' Policy covers the insured "against all *risks* of *direct physical* loss or damage to [the insured's] house, contents, and other permanent structures unless an exclusion applies." (Docket #62-3, 9 and 47) (emphasis added). As noted *infra* in Section 5.3, the exclusions Chartis invokes are each keyed to what "caused" the claimed loss.

Case 2:11-cv-00981-JPS    Filed 01/02/13    Page 14 of 25    Document 147

and tear, deterioration, [and] mechanical breakdown." *Id.* at 537.[12] Against the backdrop of *Glassner*, the Court predicts that the Wisconsin Supreme Court would hold that rainwater infiltration is fortuitous because rainwater infiltration is a risk attendant to home ownership, but not a certain consequence like wear-and-tear. Therefore, summary judgment on this ground is inappropriate.

### 5.2    Is the Strausses' Claim for the Water Damage Barred by the "Known Loss" or "Loss in Progress" Doctrines?

In 2004, the Wisconsin Supreme Court held that:

> The known loss doctrine holds that insurers are not obligated to cover losses which are already occurring when the coverage is written or which has already occurred. *Estate of Logan v. Northwestern Nat'l*, 144 Wis.2d 318, 348, 424 N.W.2d 179 (1988). Here, the fact that settlement was occurring on the [property] was known as early as March of 1995, and the extent of the damage was substantially known by the time of the meeting in January or February, 1997. The policies of these remaining insurers post-date this period. Accordingly, the known loss doctrine precludes coverage under these policies.

*Am. Girl.*, 268 Wis.2d at 58-59.

In a *vital* clarifying footnote, the Wisconsin Supreme Court held that it was the later of these two meetings – the one in early 1997 – that triggered the application of the known-loss doctrine. *Id.* at 29 n.2. That court described the factual context as follows: "[b]y early 1997, the settlement approached

---

[12] Fifteen years later, the Wisconsin Supreme Court, with reference to its decision in *Glassner*, posited that "[a]rguably a defect in the design and construction of insured property is inherent in that property, rather than an 'external cause,'" but ultimately dismissed this argument out-of-hand by expressly stating that "[w]e do not rest our decision upon this reasoning, however." *Kraemer Bros., Inc. v. U.S. Fire Ins. Co.*, 89 Wis.2d 555, 564 (1979).

one foot, the building was buckling, steel supports were deformed, the floor was cracking, and sewer lines had shifted. In January or February 1997, the parties met to discuss the settlement damage and the options for remediation." *Id.* Therefore, *Am. Girl* appears to hold that, in Wisconsin, the known loss doctrine precludes coverage under an insurance contract only if the extent of the damage was substantially known before the parties entered into the insurance contract.[13] Here, on the present state of the record before it, the Court concludes that a reasonable jury could find that the extent of the Water Damage was not "substantially known" by the Strausses before the parties contracted for Chartis' Policy. Therefore, Chartis' motion for summary judgment on this ground fails.

5.3 Do the "Faulty, Inadequate or Defective Planning" "Gradual or Sudden Loss" and "Fungi or Bacteria" Exclusions in Chartis' Policy Combine to Exclude All of the Water Damage Except Ensuing Active Water Damage Which Occurred During the Chartis Policy Period?

The Strausses and Chartis appear to agree generally that the genesis of the Water Damage is defective construction of certain portions of the House which, in the absence of such defects, would typically function to prevent rainwater infiltration (*e.g.*, the roof and windows). *See* (Docket #63, ¶14), (Docket #118, 2 and 8), and (Docket #99, 4).

Chartis invokes the following exclusions:

2. Gradual or Sudden Loss

We do not cover any loss caused by gradual deterioration, wet or dry rot, warping, smog, rust, or other corrosion. In addition,

---

[13] In *Am. Girl*, the Wisconsin Supreme Court equated the known loss doctrine with the loss-in-progress doctrine, so this Court need not address the latter any further. *See* 268 Wis.2d at 58.

we do not cover any loss caused by inherent vice, wear and tear, mechanical breakdown or latent defect. However, we do insure ensuing covered loss unless another exclusion applies.

3.      Fungi or Bacteria

We do not cover any loss caused by the presence, growth, proliferation, spread or any activity of fungi or bacteria including the cost to test for, monitor, clean up, move, remediate, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of fungi or bacteria.

This exclusion does not apply to:

a.      Coverage provided under PART II - PROPERTY. Additional Coverage. Ensuing Fungi or Bacteria; or
b.      Ensuing covered loss unless another exclusion applies.

. . .

8.      Faulty, Inadequate or Defective Planning

We do not cover any loss caused by faulty, inadequate or defective:

a.      Planning, zoning, development, surveying, siting;
b.      Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
c.      Materials used in repair, construction, renovation or remodeling; or
d.      Maintenance;

of part or all of any property whether on or off the residence.

However, we do insure ensuing covered loss unless another exclusion applies.

(Docket #62-3, 14 and 52) (bolding omitted).

The Strausses and Chartis do not agree with particularity as to the precise construction defects, *see, e.g.*, (Docket #118, 12-22), but appear to generally agree that the "Faulty, Inadequate or Defective Planning" exclusion applies to some extent. (Docket #60, 16); *see* (Docket #99, 17). Their main dispute is over the practical effect of the "Faulty, Inadequate or Defective Planning" exclusion's ensuing-loss provision. As to this issue, the parties agree that the appropriate Wisconsin authority is *Arnold v. Cincinnati Ins. Co.*, 276 Wis.2d 762 (Wis. Ct. App. 2004). (Docket #60, 16); (Docket #99, 16). In *Arnold*, a two-stage restoration of housing siding went awry:

> During the first stage, the mold, mildew and stains on the siding were removed by applying [a] stripping product, then rinsing with a pressure washer, then applying a wood restorer, and then rinsing again with the pressure washer. During the second stage, the siding was restained with a different stain. The Arnolds were satisfied with the restained siding, but in the process of removing the old stain, other parts of the house were damaged.
>
> . . .
>
> There was damage to the windows, gutters, driveway, porch, patio, roof and doors due to direct contact with [the] stripping product, as well as damage to the interior of the home, including the walls, ceiling, and carpeting, due to water and the stripping product leaking in from the damaged seals of the windows and skylights. Although most the damage occurred before Labor Day 2001, there was continuing and progressive damage caused by water coming in around the skylights.

276 Wis.2d at 770-771.

The Arnolds filed a claim under their homeowners' insurance policy and that policy excluded, *inter alia*, "Faulty, inadequate or defective" construction, but excepted from that exclusion "ensuing loss" not otherwise

excluded.[14] *Id.* at 774. The *Arnold* court viewed interpretation of an "ensuing loss" clause as a case of first impression in Wisconsin. *Id.* at 778. It held that "a reasonable insured would understand, based both on logic and on the use of 'However' at the beginning of the sentence, that the meaning of 'ensuing' here is a loss that follows the excluded loss 'as a chance, likely, or necessary consequence' of that excluded loss" and that "a reasonable insured would understand that, in addition to being a loss that follows as a chance, likely, or necessary consequence of the excluded loss, an ensuing loss must result from a cause in addition to the excluded cause." *Id.* at 779. Applying these principles to the facts of *Arnold*, the Court of Appeals of Wisconsin concluded that exterior damage was excluded under the faulty construction exclusion as was "damage to the interior of the house caused by the use of the power washer." *Id.* at 768. However, the court: (i) concluded "that any damage to the interior of house that was caused by rain in conjunction with the damaged caulking is a loss ensuing from the excluded loss caused by faulty workmanship or faulty materials"; and (ii) found that the interior ensuing loss was not otherwise excluded.[15] *Id.*

---

[14] In *Arnold*, the "ensuing loss" clause stated, "However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered." 276 Wis.2d at 774.

[15] In this connection, the court noted that "[t]here is an exclusion for 'water damage' in subparagraph 1(c) of the Exclusions section, but it is specifically defined in a manner that does not include damage from rain." *Id.* At 785.

Here, the Court applies *Arnold*[16] to the Strausses circumstances and Chartis' Policy and holds that, *if* certain *exterior* damage to the House is found to have been caused by faulty workmanship or materials (or, for this matter, any other failures specified in Chartis' Policy's "Faulty, Inadequate or Defective Planning" exclusion), that damage is excluded thereunder as a matter of Wisconsin law. Based on the record before it, the Court is obliged to find that genuine disputes of material fact exist with regard to claimed losses to *exterior* pieces of the House. *See*, *e.g.*, (Docket #118, 12-23) and

---

[16] The Seventh Circuit's holding in *Allstate* is instructive:

Although we believe that the task of the federal court sitting in diversity is to ascertain the substantive content of state law as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now, we pause to emphasize that this determination in no way implies any erosion of our precedent that, in the absence of prevailing authority from the state's highest court, federal courts ought to give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court. *See State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir.2001); *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir.1999); *Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 466 (7th Cir.1997). *See generally* E. Chemerinsky, Federal Jurisdiction § 5.3 at 323-26 (3d ed.1999) (discussing Supreme Court authorities); *Yonover*, supra at 5 n. 21. As the Supreme Court has held, "[w]here an intermediate appellate state court rests its considered judgment upon the rule of which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940).

*Allstate Ins. Co.*, 285 F.3d at 637.

(Docket #101, ¶ 20). Based on *Arnold*, the Court is also obliged to conclude that *if* certain damage to the *interior* of the House is found to have been caused by rainwater infiltration in conjunction with faulty workmanship (or faulty materials), that damage is deemed to be a loss ensuing from the excluded loss caused by faulty workmanship or faulty materials as a matter of Wisconsin law.

Under *Arnold*, the next conceptual question is whether such an ensuing loss is otherwise excluded. Chartis submits that the "Gradual or Sudden Loss" and/or "Fungi or Bacteria" exclusions apply (Docket #17, 2) on the theory that claimed and uncompensated *interior* losses to the House were "caused by gradual deterioration, [and/or] wet…rot…." and/or "caused by …wear and tear…." and/or "caused by the presence, growth, proliferation, spread or any activity of fungi or bacteria…." (Docket #62-3, 14 and 52). On the state of the record before it, the Court is obliged to conclude that genuine disputes of material fact remain as to which "risks" "caused" the Strausses' claimed and uncompensated "direct physical" losses to the *interior* of the House. *See, e.g.*, (Docket #101, ¶¶ 14, 18 and 26).

5.4    "Additional Living Expense" Coverage

Chartis' Policy provides certain additional coverages. (Docket #62-3, 11 and 49). One such area of additional coverage is "Additional Living Expense" relating to "a covered loss" under the policy. *Id.* Chartis asks the Court to find that "[t]he Strausses' Additional Living Expense [under the Chartis policy] is not covered because the house was not uninhabitable and the Strausses never moved out." (Docket #60, 2). In response, the Strausses clarify that they do not seek "lodging costs" but rather costs associated with "remov[ing] their belongings from certain areas of the house where repair

work was being performed and restrict[ing] their living area to rooms where repair work was not underway." (Docket #99, 15).

The coverage at issue states, in relevant part, as follows:

1.    Additional Living Expense

If a covered loss makes your residence uninhabitable, we cover any reasonable increase in living expenses incurred by you to maintain your household's usual standard of living. Payment will continue for the shortest reasonable amount of time necessary to restore your residence to a habitable condition or for your household to permanently locate elsewhere. If your residence is under construction and you are living in the residence at the time of loss, additional living expenses will cease once you are restored to the condition you were just prior [sic] to the loss.

(Docket #62-3, 11 and 49).

A genuine dispute of material fact exists as to whether the House was uninhabitable[17] for some period of time while remediation took place. Therefore, summary judgment on this issue is inappropriate.

5.5    Bad Faith?

Lastly, Chartis asks the Court to find "at the very least," that "whether [Chartis'] Policy covers the Strausses' claims is 'fairly debatable' such that summary judgment should be granted for Chartis and against the Strausses' on their Bad Faith action." In this connection, Chartis filed a motion seeking leave to file a supplemental memorandum in support of its Motion for

---

[17]The terms of the provision do not require an insured to actually vacate if the residence is uninhabitable; rather than promise to cover costs of hotel and restaurant dining during a period of uninhabitability, the provision introduces ambiguity by promising to "cover any reasonable increase in living expenses . . . to maintain your household's usual standard of living." (Docket #62-3, 11 and 49).

Summary Judgment on the Strausses bad faith claim "[b]ecause Wisconsin law requires the Strausses [to] support their Bad Faith Claim with expert testimony" in Chartis' view. (Docket #117, 2).

The Supreme Court of Wisconsin spoke to this issue in 1995, in holding:

> We reject the circuit court's and court of appeals' brightline rule requiring expert testimony in all bad faith tort claims. Cases presenting particularly complex facts and circumstances outside the common knowledge and ordinary experience of an average juror will ordinarily require an insured to introduce expert testimony to establish a prima facie case for bad faith. Under the facts and circumstances of other cases, however, the question of whether an insurer has breached its duty as a reasonable insurer to evaluate its insured's claim fairly and neutrally will remain well within the realm of the ordinary experience of an average juror and therefore will not require expert testimony. As this court has previously stated, "[t]he requirement of expert testimony is an extraordinary one, and is to [be] applied by the trial court only when unusually complex or esoteric issues are before the jury." White v. Leeder, 149 Wis.2d 948, 960, 440 N.W.2d 557 (1989) (citing Netzel v. State Sand & Gravel Co., 51 Wis.2d 1, 7, 186 N.W.2d 258 (1971)).

*Weiss v. United Fire and Cas. Co.*, 197 Wis.2d 365, 374 (1995).[18]

Based on the present record before it (which, as described above, contains a number of genuine disputes of material fact), the Court is unable to conclude that the Strauss-Chartis Claims present particularly complex facts and circumstances outside the common knowledge and ordinary experience of an average juror.

---

[18] *See generally, Talmage v. Harris*, 486 F.3d 968, 977 (7th Cir. 2007).

Therefore, the Court will deny both: (i) Chartis' Motion for Summary Judgment on the Strausses' bad faith claim (Docket #58); and (ii) Chartis' motion for leave to file a supplemental memorandum in support of its motion for summary judgment on the Strausses' bad faith claim for failure to designate expert testimony. (Docket #117).

6.    CONCLUSION

For the foregoing reasons, the parties' respective motions for summary judgment (Docket #'s 54, 58 and 64)) will each be denied.

Accordingly,

IT IS ORDERED that the Chubb Defendants' Motion for Summary Judgment  (Docket #54) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike Exhibit 4 to the Affidavit of Attorney Nicolas C. Mesco Filed in Support of the Chubb Defendants' Motion for Summary Judgment (Docket #95) be and the same is hereby DENIED as moot;

IT IS FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment against the Chubb Defendants (Docket #64) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that Chartis' Motion for Summary Judgment (Docket #58) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike Exhibit D to the Affidavit of Dennis D. Fitzpatrick Filed in Support of Chartis' Motion for Summary Judgment (Docket #97) be and the same is hereby DENIED as moot;

IT IS FURTHER ORDERED that Chartis' Motion to Strike Plaintiffs' [Proposed] Statement of Additional Facts in Support of Their Brief in

Opposition To Chartis's Motion for Summary Judgment in Excess Of the Limit Mandated by Civil L. R. 56(b)(2) and 56(b)(7) (Docket #112) be and the same is hereby DENIED as moot; and

IT IS FURTHER ORDERED that Chartis' Motion for Leave to File Supplemental Memorandum in Support of Motion for Summary Judgment on Bad Faith Claim for Failure to Designate Expert Testimony (Docket #117) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 2nd day of January, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge